# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JOSH WHEELER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:14-cv-0913** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **JACKSON NATIONAL LIFE** | ) | |
| **INSURANCE CO. d/b/a JACKSON** | ) | |
| **NATIONAL LIFE DISTRIBUTORS d/b/a** | ) | |
| **JACKSON NATIONAL FINANCIAL** | ) | |
| **SERVICES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Pending before the court are three Rule 56 motions. The defendant Jackson National Life Insurance Co. ("JNL") has filed a Motion for Summary Judgment ("JNL Motion") seeking dismissal of all claims brought by the plaintiff Josh Wheeler ("Wheeler") (Docket No. 32), to which Wheeler has filed a Response in opposition (Docket No. 46), and JNL has filed a Reply (Docket No. 59). Wheeler has also filed a Motion for Summary Judgment seeking judgment on all claims (Docket No. 37), to which JNL has filed a Response in opposition (Docket No. 53), and Wheeler has filed a Reply (Docket No. 63). Finally, JNL has filed a Supplemental Motion for Summary Judgment (Docket No. 71), to which Wheeler has filed a Response in opposition (Docket No. 76), and JNL has filed a Reply (Docket No. 83). For the following reasons, Wheeler's motion will be denied and JNL's motions will be granted.

# BACKGROUND[1]

This case involves claims by Wheeler against his former employer, JNL, for

discrimination and retaliation based on disability. Wheeler brings this action for equitable relief

and damages against JNL under (1) the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et*

*seq*. ("ADA"), as amended by the ADA Amendments Act of 2008; (2) the Tennessee Disability

Act, Tenn. Code Ann. 8-50-103 ("TDA"); (3) Tennessee common law; (4) the Tennessee Public

Protection Act, Tenn. Code Ann. § 50–1–304 ("TPPA"); and (5) the Family and Medical Leave

Act of 1993, 29 U.S.C. § 2601 *et seq.*, ("FMLA").[2]

---

[1] The court's discussion of the facts is drawn from JNL's Statement of [Undisputed] Material Facts in Support of Defendants Motion for Summary Judgment (Docket No. 34); Wheeler's Response thereto ("RJSUF") (Docket No. 49); Wheeler's Statement of Additional Material Facts in Response to Defendant's Motion for Summary Judgment (Docket No. 49-1); JNL's Response thereto (Docket No. 74); Wheeler's Statement of Undisputed Material Facts in Support of his Motion for Summary Judgment and Appendix (Docket Nos. 39, 41); and JNL's Response thereto ("RWSUF") (Docket No. 54); JNL's Statement of Material Facts in Support of Defendant's Supplemental Motion for Summary Judgment (Docket No. 73); and Wheeler's Response thereto (Docket No. 77), as well as the evidentiary record as a whole. Facts are undisputed unless noted by the court. Non-material facts, arguments or opinions characterized as facts, and statements of fact with no record support or incorrect record support are not discussed. The court notes that the factual filings in this matter are excessive, redundant, and poorly cited. The court declines to read these weaknesses to create disputes of material fact where they do not, in fact, exist.

[2] On April 4, 2014, Wheeler filed the initial Complaint in this action (Docket No. 1), and, on May 5, 2014, he filed an Amended Complaint (Docket No. 6). The Amended Complaint stated that: "Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission to vindicate rights pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"). Plaintiff has requested a Notice of Suit Rights. Plaintiff incorporates by reference, with intent to later amend upon receipt of his Notice of Suit Rights to include federal disability claims under the ADA, as those claims are related to the same case and controversy." (*Id*.) Following this statement, the Amended Complaint pleaded facts (*see id*. at ¶¶ 7-39) and asserted the following related causes of action: (1) FMLA violations (interference and retaliation), (2) disability discrimination under the TDA, (3) retaliation under Tennessee common law, the TPPA, and the TDA, and (4) ADA claims "included upon exhaustion." (*Id*. at ¶¶ 40-69.) On

## I. <u>Facts</u>

Wheeler is a resident of Tennessee.  JNL is a Delaware corporation with a principal place of business in Denver, Colorado and a corporate headquarters in Lansing, Michigan.  JNL maintains an office in Franklin, Tennessee.  JNL, through its subsidiaries, markets and wholesales a variety of annuities to independent and regional broker-dealers, "wirehouses," independent agents and financial institutions (collectively, JNL's "customers") through its External and Internal Wholesalers.

External Wholesalers meet face-to-face with JNL's customers.  JNL pairs an External Wholesaler with an Internal Wholesaler ("IW"), the latter of whom provides in-office support via telephone or email, such as scheduling the External Wholesaler's business meetings, closing sales, and helping agents get the products and information they need. When IWs are not performing specific tasks for their assigned External Wholesaler, they are primarily responsible for logging into the telephone "Queue" to take inbound customer service calls.  The Queue is essentially an overflow call system, where callers are put on hold if the IW they hope to reach is otherwise occupied.  Rather than "parking" the caller on hold, calls are routed to the individuals who are logged into the Queue as available.  Generally, the more individuals that are logged into the Queue and available to take overflow calls, the less time a JNL caller has to wait on hold

_____

September 15, 2015, Wheeler received a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") regarding the ADA claims and moved the court for leave to file a Second Amended Complaint for the purpose of formalizing the inclusion of the ADA claims. (Docket No. 25).  The Court granted Wheeler leave to do so (*see* Docket No. 68), and the Second Amended Complaint was filed as of December 2, 2015.  (Docket No. 69.)  The Court allowed JNL to supplement its pending Motion for Summary Judgment, which it did on December 7, 2015.  (Docket No. 71.)  Wheeler's ADA claims are, therefore, properly before the court at summary judgment, and the Second Amended Complaint is the operative complaint in this matter at this stage of the proceedings.

before their call is answered. Employees are only able to log into the Queue at JNL's office because that system permits JNL to monitor and record their calls in compliance with the supervisory obligations required by the Financial Industry Regulatory Authority ("FINRA") rules.

Wheeler was initially hired as an IW in JNL's Denver, Colorado office on April 7, 2008. JNL annually evaluated Wheeler as "Meets Expectations" or "Exceeds Expectations" each year that he worked as an IW. Wheeler took FMLA leave while employed in Denver for continuous leave related to bipolar disorder from August 11, 2009 through August 21, 2009 and for narcolepsy from February 10, 2010 through April 23, 2010. JNL recognized and regarded Wheeler as having a disability and health impairments. Wheeler's conditions include narcolepsy, bipolar disorder, anxiety, emotional deregulation, and depression. Wheeler's conditions are episodic in nature. As discussed *infra*, Wheeler's doctors have opined that episodes of some of Wheeler's conditions prevent him from working during an episode. Wheeler's doctors have not opined that he is incapable of work during time between episodic flare-ups.

At Wheeler's request, JNL transferred Wheeler to its Franklin, Tennessee office on May 7, 2011. Shortly after his transfer to Franklin, Wheeler provided JNL with FMLA Certification forms ("FMLA Certification") that were completed by his psychiatrist, Dr. Steven Nyquist ("Dr. Nyquist"), and his psychologist, Dr. Mona Bennett ("Dr. Bennett"), both of whom were treating Wheeler for bipolar disorder, that stated that Wheeler would need leave from work to attend doctor's appointments for his bipolar disorder. On February 3, 2012, Wheeler provided JNL with an FMLA Certification from Dr. Bennett that indicated that Wheeler may need intermittent leave one to three days per month for flare-ups for his bipolar disorder in addition to his doctor's

appointments.[3]

On March 9, 2012, Wheeler was hospitalized for his bipolar disorder, and his physicians indicated that he would require continuous leave through April 9, 2012. On April 9, 2012, Dr. Bennett urged JNL to consider offering Wheeler "a position that would provide reasonable balance and pacing of schedule to promote return of healthy emotional regulation" and stated that Wheeler would be unable to return to work until April 23, 2012. Wheeler had exhausted his FMLA leave as of April 5, 2012, and JNL extended Wheeler's unpaid general leave of absence through April 22, 2012.

Thereafter, in response to Wheeler's unpredictable attendance as an IW, JNL created a Floating Internal Wholesaler ("FIW") position that permitted Wheeler to remain an IW, but relieved him of the usual practice that he be teamed with a specific External Wholesaler. JNL specifically took into account the episodic and unpredictable nature of Wheeler's health conditions in creating the FIW job for Wheeler. JNL reviewed and approved Wheeler's placement as an FIW in 2012 "as an accommodation." An FIW's primary duty was to support the distribution team by being logged into the Queue to take overflow calls for the Internal Wholesalers to reduce caller wait time. The FIW job description clearly states that the "activity standards" of the position are to have six hours of Queue and/or talk time per day or three hours when making 35 logged calls. (Docket No. 35-1 at p. 104.) The job description explicitly states that "the [FIW] is expected to be on the phone and in the Queue during their working hours

---

[3] Wheeler's conditions are episodic in nature and both doctors could therefore only provide estimates as to the frequency and duration of Wheeler's flare-ups.

(7:30-4:30) . . . taking and responding to calls from the Queue is the number one priority."[4] (*Id.*)

The FIW was also responsible for serving as a backup for absent IWs.

According to Wheeler, his health-related absences had little to no impact on the

production of the business unit in which he worked as an FIW, and Wheeler's supervisors did not

need to re-assign job tasks, hire temporary workers, or burden other associates with Wheeler's

work when he was not present. JNL avers, however, that, while Wheeler's absences had little to

---

[4] In attempting to create a dispute of material fact about the duties of an FIW, Wheeler cites to deposition testimony that he contends establishes that there were other tasks that an FIW might perform and that Wheeler, in particular, did perform (*e.g.*, booking seminars, sending out invitations, working on call lists or mailers, or studying for Series 7 examinations). However, the record does not reflect that these were anything other than tangential duties that filled time in between telephone calls. JNL cannot reasonably have been expected to have employees sit idle between calls to preserve the fact that taking calls was their primary duty. The record highlights the focus of the FIW position. Donna Douglas, the Human Resources Director for JNL's Franklin office, testified that "[a] floating internal wholesaler's primary responsibility is – is to log into our phone system . . . to take incoming calls and so that is their primary role and responsibility since they are not connected directly to an external wholesaler or a specific territory. . . . They can also help externals out to make outbound calls if necessary [and] can also cover for other internal wholesalers that may be out of the office and so calls could be routed to their phone." (Docket No. 55-3 at p. 24.) In addition, when specifically asked whether she could think of any other duties, she added "[t]hose are the three primary ones." (*Id.*) Likewise, Matt Cross, Wheeler's last supervisor, testified that he "understood the responsibilities of a floating internal wholesaler to man the [Queue], which was the incoming phone calls, essentially advisors or clients on hold, looking for help in some fashion." (Docket No. 35-2 at p. 13.) Indeed, at deposition, Wheeler acknowledged the accuracy of a statement by Cross that Plaintiff's "sole duties" were to answer calls in the Queue and take inbound calls for specific territories covered by IWs who were absent. (Docket No. 35-1 at pp. 46-47.) In sum, the self-serving testimony cited by Wheeler merely establishes that these other administrative tasks came into play as alternate activities when the Queue was slow or calls were low and there was time to fill.

Wheeler further asserts that he was allowed to study for his Series 7 examinations, even when in the telephone Queue. However, this does not detract from what was the central role of the Queue to the FIW position. In his statements of fact, Wheeler repeatedly attempts to equate the fact that the Queue may have been "slow" at times with the fact that it was not the FIW's primary duty to be logged in ready to take calls. This does not follow logic or the evidence of record. The court does not find that Wheeler has established a dispute of material fact over whether being logged in and available in the Queue to take calls was the primary duty of the FIW position.

no impact on the production of the External Wholesalers, since Wheeler was not assigned to an External Wholesaler, Wheeler's absences caused the Queue to back up because there was no one assigned to cover for him if he missed work, meaning that customers waited on hold longer and that some sales may not have been closed as a result.[5]  In addition, HR Generalist Heather Robinson ("Robinson") explained to Wheeler that his job responsibilities were "critical" to JNL's business[6] and, in his 2012 performance evaluation, Wheeler's former immediate supervisor, Desk Director Kyle Anthony ("Anthony"), told Wheeler that his role was an "important one" and that the team relied upon him for correct information.  Anthony also testified that he had to assign another IW to cover Wheeler's tasks when Wheeler was absent because there was no one else to perform his job.

On September 14, 2012, Wheeler was hospitalized for bipolar disorder.  As of September 14, 2012, Wheeler had exhausted his rolling twelve-week allotment of FMLA leave.  JNL agreed to accommodate Wheeler with an unpaid general leave of absence from September 14, 2012

---

[5] Wheeler's supervisor also testified that, during May 2013 to July 2013, "the [F]IW job [was] not really getting done . . . [and] [JNL] also had a rather large problem with calls backing up in the [Queue]."  (Docket No. 35-2 at p. 16.)  He testified that JNL "needed as much help as possible" during this time.  (*Id.*; *see also id.* at 22-23 ("[W]e had a problem with the [Queue] in terms of people waiting on hold for long – extremely long sometimes long periods of time.  So any help in the [Queue] made a difference.")).

[6] Wheeler attempts to create a dispute of fact by referencing some of Robinson's notes and asserting that they reflect that Robinson contacted his supervisor about what impact Wheeler's "absences and accommodations" may have on business operations, to which her notes reflect the supervisor responded "had no business impact based on floating position."  (Docket No. 41-3 at p. 200.)  However, upon closer review the referenced notes reflect that the supervisor stated that Wheeler's arriving to work at 8:00 a.m. was not having a business impact, given his FIW role, but that if he wanted to be assigned to a specific territory, he needed to arrive to work earlier.  (*Id.*)  In the court's view, the notes do not reflect that the supervisor told Robinson that Wheeler's "absences" (as opposed to his coming in at 8:00 a.m.) would have "no business impact."  (*Id.*)

through October 26, 2012, which was the date his rolling twelve-week FMLA leave balance would replenish. JNL granted Wheeler FMLA leave from October 26, 2012 until he was able to return to work on November 26, 2012. In total, therefore, JNL granted Wheeler two general leaves of absence in 2012.[7]

Wheeler received a performance evaluation of "Meets Expectations" for 2012. This covered part of the time he worked as an IW and part of the time he worked as an FIW. Wheeler did not subsequently receive a performance evaluation for any part of 2013.

After missing five days of work on an intermittent basis in early 2013, Wheeler requested intermittent FMLA leave. On March 21, 2013, JNL provided to Wheeler a Notice of Eligibility and Rights & Responsibilities under the FMLA ("FMLA Eligibility Notice").[8] Dr. Bennett provided certification for the intermittent leave in April 2013, but he did not estimate the frequency or period of intermittent leave on this FMLA Certification. JNL approved Wheeler for intermittent FMLA leave for the period of March 14, 2013 through June 14, 2013. JNL advised Wheeler that, if he needed to call in due to his serious health condition, he had to state at the time of the call-in that his time away was due to the FMLA condition.[9] Wheeler missed four additional days for intermittent leave during March and April of 2013.

---

[7] Under JNL's General Leave Policy, JNL considers departmental workload, associate performance, business requirements, business needs, and whether the accommodation will render the employee able to perform his or her job upon return.

[8] Wheeler avers, with no record citation, that he was informed by JNL that he had 480 hours of FMLA leave available. The FMLA Eligibility Notice, however, contains no statement as to the amount of remaining FMLA leave available to Wheeler.

[9] Wheeler was not approved for continuous FMLA leave from March 14, 2013 through June 14, 2013 because Dr. Bennett did not indicate on the FMLA Certification that Wheeler would require leave for a single continuous period.

On April 24, 2013, Anthony left employment with JNL. On May 17, 2013, Matt Cross ("Cross") became Wheeler's direct supervisor. Also in May 2013, JNL hired Laural Gooden ("Gooden") as a new Senior HR Generalist to replace Robinson, who had been Wheeler's primary HR contact prior to her resignation in late March 2013.

Wheeler avers that JNL's "high-level management approved [him] for remote-work access privileges as an accommodation. Although remote-work privileges are not typically given to IWs or [F]IWs, []Wheeler was approved to work from home as needed." (RWSUF No. 28.) However, Wheeler has not testified as to *who* gave him such permission. Douglas has testified that Wheeler did not receive permission to work from home, other than email access, because no IW is allowed to work from home. (Docket No. 55-3 at pp. 155-158.) More specifically, Douglas stated that Wheeler would not have been given such authority because Wheeler's job required him to be in the building to perform the essential functions of his job. (*Id*.) Cross testified likewise, stating that he was not aware of anyone's granting Wheeler remote access so he could work from home; that he did not give him permission; and that Wheeler could not perform the essential functions of his job remotely because he could not make recorded calls. (Docket No. 35-2 at pp. 13-14.) Finally, Anthony testified that he did not give Wheeler permission to work remotely and that FIW duties cannot be performed remotely. (Docket No. 47-4 at pp. 11-12.) In short, it is undisputed that telephone Queue-related duties cannot be performed remotely, because an employee cannot log into the telephone system remotely. Wheeler only claims – and JNL admits – that he had remote email access.[10] Access to JNL's

---

[10] Based on their testimony, neither Douglas, Cross, nor Anthony are aware of the origins of Wheeler's remote email access.

email network did not allow Wheeler to log into the Queue or to take calls.

In June of 2013, Cross raised concerns with Gooden regarding his responsibilities with respect to managing Wheeler's attendance. According to JNL, Cross mentioned that Wheeler had been absent from work during May and June without calling in and that Cross was not sure how to handle the absences. Gooden and Douglas began to review Wheeler's attendance. It is undisputed that (1) Gooden and Douglas reviewed a report regarding when/if Wheeler scanned his identification badge to enter the office or building stairwell, which was required for entry; (2) Gooden and Douglas reviewed reports indicating whether Wheeler had logged into the phone system and whether he had logged into the Queue as available to take calls; and (3) Douglas also reviewed Wheeler's Microsoft Outlook emails to further review whether he had performed any work while at the office. It is also undisputed that the information collected by Gooden and Douglas demonstrated that, between April 24, 2013 and July 12, 2013 (a 58 working-day period), Wheeler had not used his identification badge and had not logged into the phone system as being physically present at work on 34 of the 58 work days. The information reviewed by Gooden and Douglas also demonstrated that Wheeler arrived to work after 12:00 p.m. on June 7, 13, 18, 21 and 24.[11]

Wheeler states that he was working during May, June, and July of 2013. Specifically,

---

[11] Wheeler objects to this averment on the grounds that it "is not a statement of fact" but rather "an assertion about the mental state of Donna Douglas," apparently because the record support for the statement is the declaration of Douglas. (RJSUF No. 40.) The court does not agree. The declaration of Douglas – who conducted the relevant investigation – and the underlying evidence is sufficient record material for this assertion of fact at summary judgment. Wheeler's suggestion that the court cannot credit any of Douglas's testimony at summary judgment because she is involved in this matter, and can only accept evidence from disinterested witnesses generally, is misplaced. (*See id.*)

Wheeler asserts that, on most of those 34 days, he was working from home with the full knowledge and acquiescence of JNL. Wheeler asserts certain facts: (1) he was given high-level remote access by JNL decision makers so that he could work from home; (2) he told Douglas that he was working during this period, (3) his wife Mara Wheeler ("Ms. Wheeler") works from home and observed Wheeler working remotely, (4) July 24, 2013 remote work records (*i.e.*, Smart Card Reports) show logins on the following dates: May 7, 2013; May 9, 2013; May 10, 2013; May 14, 2013; May 15, 2013; May 20, 2013; May 21, 2013; May 22, 2013; May 23, 2013; May 24, 2013; June 13, 2013; June 27, 2013; June 28, 2013; July 1, 2013; July 9, 2013; July 11, 2013; July 12, 2013; and July 14, 2013; and (5) July 12, 2013 TKS system records provided by Matt Cross reflect that Wheeler did not make a single request for FMLA time off to him during the months of May or June 2013.[12,13] However, the evidence of record does not reflect what work Wheeler claims to have actually been doing at home, other than occasional telephone calls or emails.

JNL had informed Wheeler that, if he was going to be absent from work for FMLA purposes, he was responsible for entering that time off into JNL's timekeeping system and coding the time as FMLA or paid time off. Wheeler did not request FMLA leave or paid time off

---

[12] As to the last of these facts, Human Resources expressly asked Cross via email on the subject "Josh's time off Requests," "Can you please let me know the dates that Josh has called you to let you know he would be out and the days he has taken PTO for time off?" Cross responded the same day, stating, "[b]elow are Josh's time off requests." None of the dates were in May or June of 2013. (*See* Docket No. 41-3 at pp. 250-251.)

[13] These facts, even if true, at most establish that Wheeler may have logged in remotely from home on certain days in May and June of 2013 and performed non-telephone remote work from home. These facts do not establish a dispute of material fact over whether Wheeler was present on-site and logged into the Queue on 34 out of 58 days in May and June of 2013; the fact that he was not remains undisputed.

in connection with any days in May or June of 2013. The information reviewed by Gooden and

Douglas revealed that, of the twenty days Wheeler had reported to work in May and June of

2013, he had logged into the Queue as being available to take calls on only two of those days.[14]

The reports further indicated that, since January 1, 2013, Wheeler had routinely not logged in as

available to take calls or had only done so for short periods of time during the workday.[15]

On June 19, 2013, JNL delivered Wheeler another FMLA Eligibility Notice ("June 19

Eligibility Notice"). The June 19 Eligibility Notice expressly stated that, as of that date, Wheeler

was "eligible for FMLA leave" and had "240 hours available due to previous occurrences." JNL

maintains that the June 19 Eligibility Notice was inaccurate, because it was sent to Wheeler

before JNL was aware that Wheeler had missed the majority of May and June. On July 5, 2013,

Wheeler provided JNL with an updated FMLA Certification, completed by Dr. Bennett,

estimating that he would require intermittent leave for bipolar disorder approximately one to

three days every two months, in addition to his one-hour doctor's appointments one to four times

per month. Dr. Bennett checked "no" in response to the FMLA Certification question, "will the

employee be incapacitated for a single continuous period?"

Douglas met with Wheeler on July 15, 2013. JNL maintains the purpose of the meeting

was to discuss Wheeler's absences; Wheeler claims its was to discuss his FMLA leave and

complaints that he had regarding Douglas and Cross. No formal record of what transpired at the

---

[14] Wheeler "disputes" this fact and "demand[s] strict proof." (*See* RJSUF No. 42.)
However, Wheeler offers no record citation or basis to establish a dispute of material fact.

[15] Wheeler "disputes" this fact and "demand[s] strict proof." (*See* RJSUF No. 43.)
Wheeler offers only a citation to the FIW job description. As discussed *supra*, Wheeler has not
established that anything other than logging into the Queue was the main duty of the FIW
position.

meeting is contained in the evidence before the court.

On July 16, 2013, Douglas delivered to Wheeler another FMLA Eligibility Notice ("July 16 Eligibility Notice"). The July 16 Eligibility Notice stated that Wheeler was a statutorily "eligible employee" for FMLA leave as of July 16, 2013, but it did not state any amount of FMLA leave that Wheeler had as of July 16, 2013.[16] JNL thereafter received an updated FMLA Certification completed by Dr. Bennett that increased the estimated frequency of his bipolar disorder flare-ups from one to three days every two months to one to four times every two to three months and for three to six days per episode.[17] JNL also received an FMLA Certification from Dr. Aaron Milstone, who was treating Wheeler for his narcolepsy, that stated Wheeler may experience unpredictable flare-ups associated with his narcolepsy that could incapacitate him once a week.[18] Based on the information provided by Dr. Milstone and Dr. Bennett after Plaintiff's July 15 meeting, Wheeler could potentially require anywhere from zero to six days off for medical leave every other week due to his bipolar disorder and could potentially require from zero to one day per week off for his narcolepsy.

---

[16] This was not a determination of Wheeler's substantive FMLA "eligibility," as asserted by Wheeler – that eligibility is determined by all the criteria set forth in 29 C.F.R. § 825.100.

[17] Wheeler "disputes [this fact] as characterized." (See RJSUF No. 49.) However, the several additional material facts adduced by Wheeler are non-responsive to this statement of fact and do not create a dispute of material fact as to the content of Dr. Bennett's updated FMLA Certification.

[18] Wheeler disputes whether this fact is material because Wheeler's "conditions related to narcolepsy do not *necessarily* interfere with his ability to work" and thus it is not guaranteed to be medically necessary for Wheeler to miss work due to narcolepsy. (*See* RJSUF No. 50 (emphasis added).) It is clear, however, that JNL took this FMLA Certification into account in its decision making, (RJSUF No. 51), making this fact material. The fact that Wheeler could have had no flare-up of his narcolepsy (or his bipolar disorder) in any given time period does not make the fact of his diagnosis non-material.

JNL's complaint procedure is reflected in its "Open-Door Policy." Employees satisfy the Open-Door Policy by speaking out to Human Resources or management. Retaliation is expressly prohibited against any employee who raises complaints or concerns in good faith pursuant to the Open-Door Policy. On July 16, 2013, Wheeler sent Douglas an email asking, "[w]ho do I file complaints or concerns that I have encountered with employees?" and referring to his meeting with Douglas on July 15. (Docket No. 41-3 at p. 264.) The email noted that Wheeler had "discussed a couple of these with [Douglas] yesterday" but that he wanted to make certain that "absolutely everything is documented." (*Id*.) Douglas notified Wheeler that he may contact her superior, Michelle McAdory ("McAdory"). Douglas informed McAdory that Wheeler may be calling her and that she was available to McAdory to discuss Wheeler's "background with HR." (*Id*. at p. 263.)

Wheeler has testified that Cross made several comments that Wheeler believed were meant to single him out and treat him differently, including: "what's wrong?," "what's wrong with you?," "why can't you be here?," and "what do you have going on with you?" (Docket No. 35-1 at p. 41.) Wheeler further testified that Cross's questions "bothered" him on one occasion when Cross asked "what is wrong with you" in front of other employees. (*Id*.) Wheeler brought these comments to the attention of JNL Human Resources Representative Dana Rapier. Wheeler also claims Cross spoke to him in a "hostile" tone of voice and laughed about his condition in front of others. (*Id*.) Wheeler also avers that Douglas once commented to him – "if you owned a company, would you hire somebody like you [and with your conditions] as an employee?" (*Id*. at p. 245.)

On July 16, 2013, again after the July 15 meeting with Douglas, Wheeler emailed Human

Resources employee Sheri Thuma about an FMLA "conundrum" and raising concerns about accountability and process regarding absences at JNL in the past versus the present. The email does not contain specific allegations about any individual. Wheeler stated that his "main concern is to move forward and have a consistent methodology again." (*Id*. at p. 262.) On July 17, 2013, Mrs. Wheeler sent an email complaint regarding alleged poor management and communication at JNL since Cross became Wheeler's supervisor and Douglas became the primary human resources contact.[19] (*Id*. at pp. 271-72.) On July 23, 2013, Wheeler sent an email to Donna Davis requesting an "ombudsman/mediator" to "resolve the issues that we have been discussing." (*Id*. at p. 265.) Wheeler wrote that he had "some situations that [he wanted to] make management aware of, but more importantly [thought] having an unbiased person [could] help us figure out why a system that [had] worked well for the past five years [had] suddenly become broken after [Anthony] and [Robinson] left." (*Id*.) On July 25, 2013, Wheeler complained in an email to McAdory about comments he believed were related to his health conditions that he believed were "uncomfortable and were frankly very inappropriate and prohibited." (*Id*. at pp. 268-69.) Wheeler also mentioned Douglas's disregard of a similar complaint that he raised against Cross in July. (*Id*.).

By July 25, 2013, JNL had completed its "reconciliation" of Wheeler's available FMLA time *vis a vis* his absences in May, June and July of 2013. JNL used various evidence to complete this process, including security badge reports, sign-in sheets, telephone systems reports ("Avaya System"), timekeeping system reports ("TKS System"), Smart Card Activity Reports,

---

[19] JNL asserts that the dissatisfaction was focused solely on the dispute about whether or not Wheeler reported time that he missed in May and June; however the email is phrased generally and does not discuss the May and June absences specifically.

Microsoft Outlook emails from a remote login, and a spreadsheet created by Douglas based on information she gathered. The TKS System records reflect that Wheeler did not make a single request for FMLA time off to Cross during May or June of 2013. JNL does not dispute that Wheeler did not code any absences in the TKS System as paid time off or FMLA during May or June 2013.

On the Smart Card Activity Reports provided to Douglas, a screen shot attachment shows remote logins on the following dates: (1) May 7, 2013; (2) May 9, 2013; (3) May 10, 2013; (4) May 14, 2013; (5) May 15, 2013; (6) May 20, 2013; (7) May 21, 2013; (8) May 22, 2013; (9) May 23, 2013; (10) May 24, 2013; (11) June 13, 2013; (12) June 27, 2013; (13) June 28, 2013; (14) July 1, 2013; (15) July 9, 2013; (16) July 11, 2013; (17) July 12, 2013; and (18) July 14, 2013. Wheeler told Douglas that he was working in May, June and July of 2013. As mentioned, Mrs. Wheeler works from home. At her deposition, Mrs. Wheeler testified that "I think that [Wheeler] wasn't completely impaired being in the bed the whole time, but he was home and dealing with everything with his condition, but he was able to work sometime from home." (Docket No. 47-5 at p. 96.) When asked if it was her "observation" that Wheeler was working at home, Mrs. Wheeler later testified that it was, rather, "her understanding." that on the days that Wheeler was home he worked remotely. (*Id*. at pp. 109-10).

According to JNL, Douglas's reconciliation concluded that Wheeler had exhausted his available intermittent FMLA leave as of July 5, 2013. This was communicated to Wheeler by letter on July 25, 2013. The letter stated that, as of July 5, 2013, Wheeler's twelve-week allotment of leave under the FMLA had been exhausted based on previous occurrences. On behalf of JNL, Douglas decided to cover all of Plaintiff's absences through July 5, 2013 with the

240 hours of FMLA time that had been available to Plaintiff prior to May 2013. Wheeler

disputes the accuracy of JNL's reconciliation, claiming that it was done after he was notified of

his FMLA eligibility on June 19, 2013 and July 16, 2013 and, thus, he had not actually exhausted

his FMLA leave as of July 5, 2013.[20] Wheeler again cites the allegations that he was working

during the May-June 2013 period, whether or not he was physically in the JNL building.[21] In

addition to its determination regarding FMLA leave, JNL permitted Wheeler to keep the wages

that he had received for all days worked after what JNL believed to be the expiration of his paid

time off on May 10, 2013. While Wheeler does not concede that he had exhausted his paid time

off, he does not dispute that JNL approved all absences prior to his termination.

Wheeler regularly physically showed up to work as an FIW between mid-July and August

5, 2013, despite the fact that he had still requested intermittent leave on an ongoing basis. On

July 30, 2013, Wheeler again voiced concerns to Dana Rapier. The next day, Rapier spoke with

Mrs. Wheeler, who again voiced similar concerns. On August 2, 2013, Wheeler notified Cross

that he was unable to perform his job duties for at least half the day. JNL does not dispute that

Cross stated to Douglas that, in recent days, Wheeler had been "a little better about being in the

[Q]ueue," which he indicated to consist of Wheeler being on the Queue for an average of (still

---

[20] JNL maintains that, if JNL had not designated Wheeler's absences through July 5 as covered by the FMLA, those absences would have been considered as unexcused, which could have resulted in Plaintiff's justifiable termination from employment for violating JNL's Attendance Policy. Wheeler disputes this assertion by claiming that those "absences" would have been considered "worked" because he actually worked from home.

[21] Wheeler maintains, without citation, that this was "an adverse reconciliation done in retaliation for complaining, taking FMLA leave, and stating an intent to take FMLA leave." (See RJSUF No. 52.)

only) one hour each day. (Docket No. 41-3 at p. 279; Docket No. 35-2 at p. 24.) Shortly thereafter, Douglas scheduled a meeting with Mr. and Mrs. Wheeler for August 5, 2013.

On August 5, 2013, Douglas and Gooden met with Wheeler and Mrs. Wheeler and shared the results of JNL's reconciliation of Wheeler's attendance with respect to his exhaustion of available FMLA leave and paid time off. Douglas provided Wheeler with a color-coded spreadsheet reflecting the numerous dates that Douglas had classified as leave taken pursuant to the FMLA. In addition to reviewing Wheeler's attendance, Douglas's notes from the meeting reflect that she informed Wheeler that "[w]hen he is at work he is not performing the essential functions of his position because he is not taking calls and not logging in [to the Queue]."[22] (Docket No. 41-3 at p. 288.) Further, notes show that Douglas explained that Wheeler had been absent for most of May and June and had been paid for work he did not perform. (*Id*.) In response, Wheeler provided several Microsoft Outlook emails to Douglas that demonstrated that he had delivered emails from his work login from a remote location on several dates that Douglas had listed as "FMLA Reconciliation." Douglas concluded that the emails were not work related.[23] Wheeler also stated that Cross had never spoken with him about any issues or written him up for being absent during the period being discussed. Cross expressed his disdain for the manner in which JNL had handled him after Anthony and Robinson had departed. Douglas

---

[22] Wheeler disputes this fact by stating: "[t]he records identified indicate that [Wheeler] was performing all job duties demanded of him as a Floating Internal Wholesaler." (RJSUF No. 61.) This statement is too general to be of any assistance and is without citation. Wheeler further cites the fact that, on August 2, 2014, Douglas was informed by Cross that Wheeler was more regularly showing up at work and "being better at being in the Queue." (*Id*.) However, this does not create a dispute of material fact as to Douglas's backward-looking analysis of Wheeler's attendance logging-in behavior.

[23] Wheeler has not submitted record evidence to the contrary.

stated that she reconciled Wheeler's time as FMLA leave because he was not in the building and there was no evidence that her had performed any work during the relevant time periods. (*Id.*) Douglas informed Wheeler that, if he wished to continue to work at JNL, then he must request an unpaid general leave of absence while JNL followed up with his doctors regarding their recent medical certifications to determine whether JNL could further accommodate Plaintiff's medical condition in a way that would permit him to perform the essential functions of his job. If Wheeler did not wish to do so, he could be terminated.[24]

Wheeler asked Douglas to explain what would be the grounds for termination. Douglas testified that the reason for Wheeler's termination would be because "he is not able to do the essential functions of his job, and he doesn't have job protection at this time."[25] (*Id.*) Wheeler maintained that, as a matter of fact, he was "regularly working" and not in need of (or voluntarily requesting) a "continuous" general leave of absence as of August 2013. JNL avers that, although Wheeler was at work the week preceding August 2, 2013 (1) from May 1 to July 15, he was absent on 35 days, (2) on July 16 and 18, Wheeler's physicians informed JNL that Wheeler should be expected to continue to frequently experience lengthy episodes rendering him unable to work for as much as two weeks each month and one day each week, all on an unpredictable

---

[24] General leave is offered by JNL to employees in need of leave who are either ineligible for or exhausted of FMLA leave. JNL does not request that employees take a general leave of absence, regardless of condition or needed accommodation. An employee may request additional general leave when an employee has exhausted FMLA leave and additional leave is needed. Douglas could not recall any other employee, aside from Wheeler, ever being denied a request for a general leave of absence.

[25] Mrs. Wheeler's recollection of this exchange differs from that of Wheeler. Mrs. Wheeler testified that Wheeler asked Douglas the specific question, "On what grounds would you – would it be terminated? Would it be medical?" and that Douglas responded "No, we can't say that. So we would have to ask you to resign." (Docket No. 47-5 at pp. 99-100.)

basis, and (3) Wheeler had missed work on August 2 and was only averaging an hour on the Queue each day (his primary function). In the end, Wheeler opted for the temporary leave of absence while JNL explored with his physicians whether he would be able to return to work and perform the essential functions of his job in the future. At the conclusion of the meeting, Douglas advised Wheeler to return to work until further notice. At 1:57 p.m. on August 5, Wheeler sent Rapier an email inquiring about the status of his prior complaints about perceived discriminatory comments made by Douglas. At 3:27 p.m. that day, Douglas alerted Wheeler to pick up a signed letter and spreadsheet regarding the earlier meeting. The letter outlined the following change of circumstances: "NOTE: Although I advised you differently earlier today when we met, you should not return to work until such time as Jackson notifies you to do so. Jackson will consider you as on an unpaid leave of absence pending your decision as outlined above." (Docket No. 41-3 at p. 291.)

Between August 5, 2013 and August 9, 2013, Wheeler requested FMLA paperwork from JNL, but JNL did not provide it. JNL explained to Wheeler that it was not providing the FMLA paperwork because Wheeler's FMLA leave was expired. JNL provided Wheeler with paperwork for a general leave of absence. On August 8, 2013, Wheeler sent McAdory an email regarding his prior complaints, inquiring as to why: (1) Douglas did not let him file a formal written complaint against Cross for making discriminatory comments and (2) he did not get to file a formal complaint against Douglas for making discriminatory comments. Douglas sent Cross a message communicating that: (1) she was turning off Wheeler's security badge; (2) human resources would "review all medical documentation and make a decision whether to ant [sic] him leave"; and stating (3) "[w]e want to make sure he isn't getting paid for time away from work."

(Docket No. 41-3 at p. 292.)  Douglas specifically advised Cross to enter unpaid time into the TKS System to ensure that Wheeler was not paid for time away from work.

JNL sought additional medical opinions from Wheeler's treating medical professionals to determine if the accommodation of a general leave of absence would render him capable of performing the essential functions of his job in the future.  Dr. Milstone opined that Wheeler's narcolepsy was incurable, that Wheeler would suffer episodic flare-ups of unpredictable frequency and that the flare-ups could render Wheeler incapable of performing his JNL job for up to seven days at a time.[26]  In addition, Dr. Bennett advised JNL that the duration of Plaintiff's bipolar disorder was unknown, that he would have panic attacks which would be unpredictable with respect to frequency and which could last for weeks, during which time Plaintiff would be unable to perform the essential functions of his job.

JNL then determined that a general leave of absence was not an appropriate accommodation for Wheeler's medical conditions, as it was unlikely to lead to Wheeler's being able to regularly and predictably perform the aspect of his job that involved being onsite and logged into the Queue to take calls.[27]  JNL further concluded that Wheeler's medical conditions were life-long and, notwithstanding medical intervention, he would suffer lengthy occasions, unpredictable both with respect to timing and frequency, leaving him unable to perform the

---

[26] Wheeler's objection to this fact being undisputed is again that his "[p]osition did not demand 'predictable attendance' as an essential job function.  This is premised upon the assumption that Wheeler has established a dispute of fact concerning the primary duty of the FIW position; the court has found that this is not the case.

[27] Wheeler's objection to this fact is again premised upon the assumption that Wheeler has established a dispute of fact concerning the primary duty of the FIW position; the court has found that this is not the case.

essential functions of his job.  JNL informed Wheeler that it had determined that a leave of absence would not enable him, in some predictable and reasonable time, to return to work and capably perform his essential job functions and that it was terminating his employment on that basis, effective August 9, 2013.

On that date, JNL delivered to Wheeler an email with two attachments: (1) his termination letter and (2) "a copy of the doctors' reports that provide [JNL] the medical information upon which it relies for its determination."  (Docket No. 41-3 at pp. 322-23.)  The termination letter acknowledges that its decision was based on the medical information provided by Dr. Bennett and Dr. Milstone.  (*Id*.).  JNL wrote to Wheeler that, "as you can see from the reports, both doctors opine that the medical conditions that apparently cause your inability are lifelong."[28]  (*Id*.)  The letter states that, "notwithstanding medical intervention, you will suffer lengthy occasions, unpredictable both with respect to timing and frequency, during which . . . you will be unable to perform your [JNL] job functions."  (*Id*.)  JNL asserts that "medical information demonstrates that a general leave will not enable you in some predictable and reasonable time to return to work and capably perform your job functions."  (*Id*.)  The letter further stated that JNL had "completed its investigation" into Wheeler's accommodation request and that JNL had "determined that a general leave of absence would be neither a reasonable no[r] effective accommodation."[29]  (*Id*.)

---

[28] Wheeler correctly indicates that Dr. Bennett did not use the specific term "lifelong." Dr. Bennett used the term "unknown duration."  Douglas has testified that, in conjunction with Dr. Bennett's previous characterization of Wheeler's illness as a "chronic condition," she interpreted this to mean lifelong.

[29] JNL admits that, for this reason, it did not consider whether granting Wheeler a general leave of absence would create an undue hardship for JNL's business (rather than simply

The FIW position has a corrective action disciplinary process, and Douglas testified that, where such a process exists at JNL, it is generally followed.[30] The progressive discipline process included the following three steps: (1) verbal warning; (2) a written Activity Standards Performance Improvement Plan; then (3) if the employee again fails to meet expectations, the employee may be subject to termination. Wheeler avers that the proper reprimand at the August 5, 2013 stage under the FIW corrective action process should have been a verbal warning. Douglas testified about how JNL would typically apply a corrective action process such as the FIW process, stating: "when there is a performance or attendance issue . . . we would review it. We could potentially put someone through coaching and counseling, we could put them on a formal corrective action plan and then – or we can go straight to termination, again depending upon the situation." (Docket No. 55-3 at p. 101.) JNL has also offered testimony that Wheeler was warned several times that he needed to be in the Queue and taking calls at work. Nevertheless, JNL does not dispute that it did not follow each of the corrective action steps set forth in the FIW job description prior to discharging Wheeler on August 9, 2013, after it learned that Wheeler's physicians were of the opinion that he could not be expected to routinely and predictably attend work in the foreseeable future. Indeed, JNL has admitted that the medical information reviewed by JNL between August 5, 2013 and August 9, 2013 had a direct impact on Wheeler's termination.

## II.  Procedural History

terminating Wheeler); nor did JNL inquire of Wheeler as to other potential accommodations.

[30] Douglas testified that there are certain other categories of operations employees at JNL that have a progressive disciplinary process for attendance that must be strictly enforced, as opposed to generally enforced, by JNL.

Wheeler initiated this action on April 4, 2014 (Docket No. 1) and filed an Amended

Complaint on May 5, 2014 (Docket No. 6).  On May 28, 2014, JNL answered the Amended

Complaint.  (Docket No. 9.)  The Amended Complaint included placeholder claims for

Wheeler's ADA claims, which remained pending for administrative exhaustion before the Equal

Employment Opportunity Commission.  On September 16, 2015, Wheeler filed a Motion to

Amend the Complaint Upon Administrative Exhaustion to formally include his ADA claims.

(Docket No. 25.)  After extensive briefing, the court granted this motion (Docket No. 68), and the

Second Amended Complaint was formally docketed on December 2, 2015 (Docket No. 69).

While the Motion to Amend was pending, the parties filed their cross-motions for

summary judgment.  First, on October 15 2015, JNL filed its Motion for Summary Judgment.

(Docket No. 32.)  JNL did not, however, move for summary judgment on the placeholder ADA

claim.  (*Id*.)  On October 9, 2014, Wheeler filed his Response.  (Docket No. 46.)  On October 19,

2014, JNL filed a Reply.  (Docket No. 59.)  Second, on October 16, 2014, Wheeler filed his

Motion for Summary Judgment.  (Docket No. 37.)  On October 10, 2014, JNL filed its Response.

(Docket No. 53.)  On October 19, 2014, Wheeler filed a Reply.  (Docket No. 63.)  Wheeler

moved for summary judgment on all claims, including the placeholder ADA claims.

Upon the docketing of the Second Amended Complaint in December 2015, the court

allowed JNL to supplement its Motion for Summary Judgment concerning the ADA claims.

Instead of doing so,  on December 7, 2015, JNL filed a Supplemental Motion for Summary

Judgment concerning those claims.[31]  (Docket No. 71.)  On December 16, 2015, Wheeler filed a

---

[31] In this Memorandum, for ease of analysis, the court will treat JNL's Motion for
Summary Judgment and Supplemental Motion for Summary Judgment as a unified whole.

Response.  (Docket No. 76.)  On December 28, 2015, JNL filed a Reply.  (Docket No. 83.)

## LEGAL STANDARD FOR RULE 56 MOTIONS

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable."  *Anderson*, 477 U.S. 242, at 252.  An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"On cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party

whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir.

2012) (internal quotation marks and brackets omitted).

**ANALYSIS**

**I.      The Defendant's Motion for Summary Judgment**

      **A.      ADA and TDA Claims**

           **1.      Discrimination Claims**

Wheeler alleges that JNL discriminated against him and terminated him, in violation of

the ADA and the TDA, because he was disabled.  The ADA and TDA protect disabled

employees from discriminatory treatment.  *See* 42 U.S.C. § 12112(a).  Under the ADA, no

covered entity shall discriminate against a qualified individual with a disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment.  *Id.*  The

TDA prohibits private employers from discriminating against employees "based solely on any

physical, mental, or visual handicap of the applicant, unless such handicap to some degree

prevents the applicant from performing the duties required by the employment or impairs the

performance of the work involved."  Tenn. Code Ann. § 8-50-103(a).  A claim brought under the

TDA is analyzed under the same principles as those utilized for the ADA.  *Cardenas-Meade v.*

*Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (citing *Sasser v. Quebecor Printing (USA)*

*Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)); *Nance v. Goodyear Tire & Rubber Co.*, 527

F.3d 539, 553 n.5 (6th Cir. 2008) ("Both federal and Tennessee disability discrimination actions

require the same analysis.") (citation omitted).

A plaintiff may prove employment discrimination under the ADA based upon circumstantial evidence using the *prima facie* case and burden shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). A *prima facie* case under the ADA requires a plaintiff to establish that (1) he is a disabled person within the meaning of the ADA, (2) he is qualified, that is, with or without reasonable accommodation which he must describe, he is able to perform the essential functions of the job, and (3) the employer terminated him because of his disability. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360-61 (10th Cir. 1995)). The ADA requires courts to consider the employer's business judgment when determining the essential functions of a job. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013).

JNL does not dispute that Wheeler had a disability and that Wheeler suffered an adverse employment action. However, JNL argues that Wheeler has not established that he was qualified, with or without an accommodation, to perform the essential functions of his job because Wheeler's physicians informed JNL that Wheeler could not regularly and predictably attend work and would not be able to do so in the foreseeable future.

The Sixth Circuit has long held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA." *Gantt*, 143 F.3d at 1047 (internal quotation marks omitted); *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012) (affirming *Gantt* and finding a custodian whose job required on-site manual labor and who could not meet attendance requirements could not make a *prima facie* case). Accordingly, excessive absenteeism can render an individual unqualified under the

ADA as a matter of law, except in the exceptional case where an employee can effectively

perform at home without a substantial reduction in the quality of his performance. *Smith v.*

*Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (citing *Vande Zande v. Wisconsin*, 44 F.3d 538,

545 (7th Cir. 1995)); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 419 (6th Cir. 2004).[32]

In 2014, a panel of the Sixth Circuit reiterated that, "for many positions, regular

attendance at the workplace is undoubtedly essential." *E.E.O.C. v. Ford Motor Co.*, 752 F.3rd

634 (6th Cir. 2014). However, the panel then proceeded to distinguish between cases in which,

on the one hand, presence at the physical worksite of the employer is critical to the nature of the

employee's work, and, on the other hand, cases in which an employee can perform his or her job

duties anywhere due to modern technological remote work arrangements. *Id.* at 641. The panel

wrote that "the vital question . . . is not whether "attendance" was an essential job function . . . ,

but whether physical presence at the [worksite] was truly essential." *Id.* In 2015, the Sixth

Circuit, sitting *en banc*, reversed that panel decision. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753

(6th Cir. 2015). The court clearly held that "regular, in person attendance is an essential function

---

[32] *See also, e.g.*, *Colón–Fontánez v. Municipality of San Juan*, 660 F.3d 17, 33 (1st Cir. 2011) ("This Court – as well as the majority of circuit courts – has recognized that attendance is an essential function of any job." (internal quotation marks omitted)); *Vandenbroek v. PSEG Power, CT LLC*, 356 F. App'x 457, 460 (2d Cir. 2009) (noting that "regularly attending work is an essential function of virtually every job" (internal quotation marks omitted)); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (observing the conclusion of most courts that "physical attendance in the workplace is itself an essential function of most jobs"); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (*en banc*) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job."); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) (noting that job presence is "an essential function of a job"); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999) ("Further, it is axiomatic that in order for [an employee] to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work.").

– and a prerequisite to essential functions – of most jobs, especially the interactive ones. That's the same rule that case law from around the country, the statute's language, its regulations, and the EEOC's guidance all point toward."[33]  The court applied that rule to hold that a plaintiff with irritable bowel syndrome, who (1) had a job that required customer and team member interaction and (2) was unable to regularly and predictably attend work, was prevented from performing the essential functions of her job and therefore was not entitled to protection under the ADA.  *Id.* at 761-763; *see also, e.g., Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002) (holding that an employee who was discharged for absences associated with narcolepsy did not present proof that defendant fired her "solely because of her disability" under the ADA because plaintiff was terminated for her absences).  The EEOC's informal guidance cuts in the same direction.  Namely, an employer may refuse a tele-commuting request when, among other things, the job requires "face-to-face interaction and coordination of work with other employees," "*use of certain equipment or tools that cannot be replicated at home*," "in-person interaction with outside colleagues, *clients*, or *customers*," and "immediate access to

---

[33] The Sixth Circuit has acknowledged that "[t]he inquiry into whether a function is essential is highly fact specific."  *Hoskins v. Oakland Co. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (1998)).  The court has also recognized that 29 C.F.R. § 1630.2(n)(3) enumerates several factors that courts may consider in determining if a function is essential.  Those factors include: "(1) an employer's judgment that the function is essential; (2) written job descriptions; (3) the amount of time on the job devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar jobs." 29 C.F.R. § 1630.2(n)(3).  However, the court explicitly noted in the *Ford Motor Co. en banc* decision that the consideration of these factors, alongside the record, standards of review, and burdens of proof, should not trump the "commonsense notion" and "general rule" that non-judges and judges hold regarding the fact that regular attendance is an essential function of most jobs, especially interactive ones.

documents *or other information located only in the workplace.*" EEOC Fact Sheet, Work At Home/Telework as a Reasonable Accommodation (Oct. 27, 2005), http://www.eeoc.gov/facts/telework.html (emphasis added).

This court must give consideration to JNL's judgment as to what functions of the FIW job are essential, including the written job description. *See* 42 U.S.C. § 12111(8). Moreover, a job function may be considered essential if the reason the position exists is to perform that particular function. 29 C.F.R. § 1630.2(n)(2). In other words, "essential functions" refer to job duties that are "fundamental" rather than "marginal." 29 C.F.R. § 1630.2(n)(1). In addition, a job task is understood by the courts to be essential if its removal would "fundamentally alter" the nature of the position. *Ford Motor Co.*, 782 F.3d at 762.

Here, the record undisputedly reflects that JNL requires that IWs and FIWs regularly and predictably attend work. The record also undisputedly reflects that, while attending work, all FIWs must be present on-site and logged into the Queue daily from 7:30 a.m. to 4:30 p.m. to take inbound phone calls and thereby assist External Wholesalers in servicing customers. The FIW job description clearly states that the "activity standards" of the position are to have six hours of Queue and/or talk time per day or three hours when making 35 logged calls. The job description further explicitly states that the FIW is expected to be on the phone and in the Queue during their working hours of 7:30 to 4:30 and that taking and responding to calls from the Queue is the number one priority of the FIW. *Compare with, e.g., Ward v. Mass. Health Res. Inst.*, 209 F.3d 29, 35 (1st Cir. 2000) ("What is noticeably absent from the record is any evidence that the nature of [the employee's] position [] requires that he be present during specific hours of the day. In

fact, the record suggests otherwise.").  In Wheeler's own deposition, he acknowledged the

accuracy of the FIW job description and that he was expected to log into the phone system daily.

> Q: All right. And when [the job description] says, '6 hours for queue and
> talk-time combined,' what did you understand that to mean?
> A: It just means that you're in the queue available for rollover calls or you
> have a combination of you've been talking with reps or customer service
> or whoever the case may be.
> Q: So 6 hours for queue and talk-time combined would be you're in the
> queue and the 6 hours would include the calls that you take that come into
> the queue?
> A: Yes, sir. . . .
> Q: Okay. The second bullet there says, 'The associate is expected to be on
> the phone and in the queue during their working hours of 7:30 to 4:30'; is
> that right?
> A: Yes, sir. . . .
> Q: As I understand it at a – as the employee – the floating internal
> wholesaler, you would log into the phone system each day; is that right?
> A: Correct.

(Docket No. 35-1 at p. 28.)

As such, despite whatever protest he may now make, Wheeler has acknowledged that

these on-site duties were his primary tasks, that they could not be performed remotely, and that

he was advised that he would be held to the same standards as other IWs and FIWs when

working.  Necessarily, therefore, the removal of attendance at the JNL worksite and logging into

the FINRA-monitored Queue would fundamentally alter the nature of the FIW position because,

if that were to occur, Wheeler would not be able to perform *any* of his primary duties.

Accordingly, regular on-site attendance and taking calls in the Queue were clearly essential

functions of Wheeler's FIW position.[34]  *See, e.g., Melange*, 482 F. App'x at 84); *Samper*, 675

---

[34] Wheeler has submitted multiple briefs in which he argues at great length that neither
'predictable' nor 'on-site' attendance was an essential function of his job and that he was
qualified to perform all actual essential job functions of the FIW position, which was created for
him with the expectation that he may be absent or working away from the building at essentially

F.3d at 1239 (concluding that on-site attendance was an essential function of the job for a neonatal nurse who provided patient care); *Brenneman*, 366 F.3d at 420 (holding the same regarding a pharmacy technician who was unable to prepare medicines away from the employer's facility); *Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727 (3d Cir. 2009) (finding attendance essential based on job description of emergency room technician that included "taking calls and working shifts as required"); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 446 (8th Cir. 1998) (concluding that deference to the employer's view that attendance was an essential function of the job for an airline customer service gate and telephone agent was appropriate); *McIntyre-Handy v. APAC Customer Servs., Inc.*, 2005 WL 5369158, at *5 (E.D. Va. May 13, 2005) (holding that attendance was an essential function of the position for a telephone call center job and opining "Plaintiff's job was to process inbound calls for UPS at a call center. If plaintiff was not at the call center, she was unable to process calls. Because plaintiff's [bipolar disorder] made her repeatedly and unpredictably tardy and absent from her job, plaintiff was unable to perform the essential functions of her job.").

---

any time. The court finds this argument – which is essentially one that JNL made Wheeler's attendance purely optional and rendered his on-site duties purely non-essential – to be without merit based on the record and designed largely to create disputes of material fact where none exist. Indeed, it would defy logic that, if JNL did not actually expect Wheeler to regularly and predictably attend work as part of his FIW position accommodation, JNL would have created a position that formally required attendance and required Wheeler to request FMLA leave and to submit FMLA certification paperwork. Rather, Wheeler would not have needed FMLA leave to excuse his absences because his absences would have already been excused by JNL's permissiveness or accommodations.

Moreover, for the first time, in his December 28, 2015, Reply to the Supplemental Motion for Summary Judgment, Wheeler raises the argument that JNL did not actually *require* him to perform his telephone Queue duties prior to July 23, 2013. Aside from being made very late, the court finds this "kitchen sink" argument lacks support and is contrary to Wheeler's prior testimony that he understood telephone Queue duties to be the key duty of the FIW position.

Wheeler contends that, because JNL considered his unpredictable attendance when creating the FIW job for him, regular job attendance was not included as an essential function of the FIW position. However, Wheeler has no factual support for this assertion, no matter how many times he repeats it. The record reflects that JNL removed Wheeler from the IW position in order to avoid harm to the External Wholesalers caused by Wheeler's unpredictable attendance and also in response to Wheeler's physician's recommendation that a different job with less stress would assist Wheeler in improving his health and performing satisfactorily. (*See* Docket No. 35-2 at pp. 8-9; Docket No. 55-3 at p. 25.). Wheeler has simply offered no record evidence to support the assertion that JNL created the FIW position based on the premise that his regular attendance would not be of importance.

The court finds that the factual circumstances of this case are analogous to *Ford Motor Co.* and the wealth of ADA caselaw in this area. On the whole, the record reflects that Wheeler was not able to fulfill the essential functions of his job – *i.e.*, the requirements of consistent on-site attendance and taking calls while logged into the Queue – sufficient to be considered a qualified employee under the ADA. Wheeler undisputedly did not comply with the worksite attendance requirements for the majority of May and June of 2013. Wheeler's claims (and Mrs. Wheeler's testimony) that he "worked from home" during most of these months are of no moment, as it was clearly impossible for Wheeler to fulfill the essential telephone Queue duty requirements from home. In mid-July 2013, Wheeler's physicians updated JNL on Wheeler's conditions, indicating that Wheeler should be anticipated to routinely require time off from work on an unpredictable basis as much as every other week and one day every week. Wheeler then missed more time in July and August of 2013 after having exhausted his FMLA leave. In August

2013, Wheeler's physicians provided additional opinions that reflected a deterioration in Wheeler's prognosis.[35] Dr. Milstone opined that Wheeler's incurable narcolepsy would cause flare-ups of unpredictable frequency that could render Wheeler incapable of performing his job for up to seven days at a time. Dr. Bennett advised that Wheeler's bipolar disorder would result in unpredictable panic attacks that could last for weeks, during which time Wheeler would be unable to perform his job. In other words, Wheeler's conditions would not be affected merely by additional time off, nor would they have a predictable end point. Because Wheeler was not a qualified individual under the ADA and JNL possessed no evidence that Wheeler's situation was likely to improve in the future, JNL's decision to terminate Wheeler did not violate the ADA or the TDA.

Wheeler's personal view that other tangential or "remote work" duties are essential to the FIW position is belied by the record and does not create a dispute of material fact that preserves a discrimination claim. There is a good reason courts "are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." *Mason*, 357 F.3d at 1122. This is because any employee could provide a court with "self-serving testimony" that his job was amenable to working remotely. *Id.* Wheeler's subjective opinion lacks support in the record. Wheeler offers no evidence that anyone specific

---

[35] For this reason, Wheeler's reliance on satisfactory performance reviews from pre-2013 time periods is misplaced. Courts have held that an "ADA plaintiff may not rely on past performance to establish that []he is a qualified individual without an accommodation when there is undisputed evidence of diminished or deteriorated abilities." *Jones v. Walgreen Co.*, 679 F.3d 9, 18 (1st Cir. 2012) (citations and internal quotation marks omitted); *see also Hummel v. Cnty. of Saginaw*, 40 F. App'x 965, 969 (6th Cir. 2002) (where employee worked for nine months before lung surgery but then had a resection of lung reducing its capacity by twenty-five percent, finding employee was unable to rely on past physical performance, where her medical circumstances had materially changed since she began work).

ever gave him remote work privileges for a specific reason (aside from the bare existence of the ability to send email), and the universal testimony of the relevant JNL personnel and evidence of record refutes what Wheeler claims: specifically, that to perform the essential functions of his job, Wheeler could *not* be at home and had to be logged into the Queue at the JNL worksite.

As he must, Wheeler concedes that his telephone Queue duties could not be performed remotely. Rather, Wheeler claims that he performed a "multitude" of other job functions from home. However, the court finds no evidentiary support for this claim. Wheeler has acknowledged that his "sole responsibilities [were] 1) helping out in the [Q]ueue at all times, and 2) helping out by taking inbound calls in specific territories if IW's were out of the office." (Docket No. 35-1 at pp. 46-47.) While Wheeler may have had other tangential tasks aside from answering the phone (including, naturally, tasks to fill time when the phones were not busy), Wheeler has not adduced record evidence (other than Wheeler's own opinion) that JNL ever permitted Wheeler to *disregard* his essential duties of being logged into the Queue. Finally, the record reflects that the remote access Wheeler had allowed him only to send and receive emails; there can be little question that doing so hardly meets the written job description of the FIW position.

Put simply, what matters for this analysis is that it was essential to Wheeler's FIW position to be in physical attendance at JNL and logged into the Queue taking calls, and he could not reliably and predictably do so if engaged in non-telephone tasks or working from home. *See, e.g., Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1582 (N.D. Ga. 1994) (finding employee was not a qualified employee under the ADA because, where she was required to sign in to telephones for 8.5 hours per day and conceded that taking telephone calls during that time was a

35

major part of her job, the telephone duties were an essential function of her position and she was unable to complete them). Accordingly, Wheeler could not be a qualified employee under the ADA on the mere basis of the existence of remote email privileges or the performance of peripheral office tasks.

Wheeler also appears to argue that, by repeatedly not taking action against him for prior rampant absenteeism, JNL should be precluded from being able to do so in 2013 (or, stated differently, should be required to continue to extend leave as an accommodation in 2013). This is wrong for three reasons. First, it ignores the fact that the supplemental prognoses of Drs. Bennett and Milstone indicated deteriorating conditions that would preclude Wheeler's predictably regular attendance at work in 2013 and beyond. JNL is certainly able to act on this new information. Second, the argument does not withstand logic: taken to its conclusion, a generous employer who accommodates an employee with leave at some point can never subsequently enforce the requirement that regular and predictable attendance is an essential function of that employee's position. Third, it ignores the fact that the law does not require an employer to wait for an indefinite (or unlimited) period of time for an accommodation to achieve its intended effect. *Gantt*, 143 F.3d at 1047; *see also Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999) ("Rather than attempting to show that []he is a qualified individual [], [Plaintiff] seems to want to turn the ADA on its head. It is as if []he thinks that rather than ensuring that []he be allowed to work, the ADA requires [Defendant] to provide [him] with a job but not require that []he regularly perform it . . . The [ADA] does not go so far.") In short, a lack of prior discipline of Wheeler by JNL for absenteeism does not establish that regular and predictable attendance was not required for the FIW position. Wheeler's argument rests on the faulty

36

premise that an employer who, for some period of time, does not harshly discipline an employee for absences is somehow forever bound to maintain a "hands-off approach" with that employee. This is not the law.

Because Wheeler was not a qualified individual under the ADA as a result of his attendance problems, to advance an ADA claim Wheeler must be able to show that he would be "otherwise qualified" with an accommodation. In support of this argument, Wheeler argues that he would have been otherwise qualified had JNL simply continued to grant him indefinite, intermittent leave – in essence, the same accommodation that JNL had extended to Wheeler in the past. However, this ignores the fact that Drs. Milstone and Bennett had provided opinions that Wheeler's ability to work regularly and predictably would look no better (if not worse) in the future than in the past. The ADA does not contemplate requiring JNL to indefinitely offer Wheeler an unsuccessful accommodation in the face of a worsening situation. *See, e.g., Corder v. Lucent Techs.*, 162 F.3d 924, 928 (7th Cir. 1998) (holding that the employee was not a qualified individual entitled to the protection of the ADA where she made a continued request for an unpredictable amount of leave time, and there was nothing in the record to suggest that the future would look any different from the past and observing that a "request for an 'unpredictable' amount of leave time as an ongoing accommodation actually contradicted her assertion that she would regularly attend work in the future"); *Jones v. Sharp Elecs. Corp.*, 2014 WL 806131, at *3 (Tenn. Ct. App. 2014) (summary judgment appropriate for TDA claim, when disability prevented plaintiff from performing her duties, absent an accommodation in the form of additional leave time). Accordingly, Plaintiff was not "otherwise qualified" with an accommodation and is also not entitled to the protection of the ADA or TDA on this basis.

Wheeler wishes to disregard JNL's business judgment as to the essential functions of his job and recreate an FIW position of his liking – namely, one that did not require regular or predictable attendance and participation in the Queue. This is not, however, supported by the record before the court. In *Ford Motor Co.* the Sixth Circuit stressed that "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to [employee] production standards." 782 F.3d at 762 (citing 29 C.F.R. § 1630(n)). "Nor is it meant 'to require employers to lower such standards.'" *Id.* Based on the totality of the evidence discussed herein, JNL is entitled to summary judgment on Wheeler's ADA and TDA discrimination claims.

### 2.    Failure to Accommodate Claims

As an alternative claim, Wheeler contends not that attendance in general is an essential function of the FIW position, but, rather, that his proposed variation to the attendance policy – ongoing, intermittent leave at his discretion – constituted a reasonable accommodation that JNL failed to provide. JNL argues in response that it was not obligated to provide Wheeler with the accommodation of ongoing, intermittent leave at Wheeler's discretion, given the job description of the FIW position.

Discrimination under the ADA includes an employer's failure to make "reasonable accommodations[36] to the known physical or mental limitations of an otherwise qualified

---

[36] Under the ADA, "reasonable accommodation" includes:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training

individual who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." 42 U.S.C. § 12112(b)(5)(A); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). To advance a failure to accommodate claim under the ADA, therefore, an employee must show that he requested a reasonable accommodation and that the employer failed to provide the necessary accommodation. *Myers v. Cuyahoga Cnty*, 182 F. App'x 510, 515 (6th Cir. 2006). Importantly, courts have held that "[a]n accommodation that would allow [an employee] to simply . . . miss work whenever []he felt []he needed to and apparently for so long as []he felt []he needed to [a]s a matter of law . . . [is] not reasonable on its face." *Samper v. Providence*, 675 F.3d 1233, 1240 (9th Cir. 2012) (internal quotation marks omitted) (cited in *Ford Motor Co.*, 782 F.3d at 761); *see also Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 528 (6th Cir. 2015) (holding that an unlimited ability to leave work through the use of intermittent leave is not reasonable as a matter of law); *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 778 (8th Cir. 2001) (holding that an unlimited ability to leave work is not a reasonable accommodation); *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999) (holding that a business is not required by the ADA to offer an accommodation that would result in tolerating "erratic, unreliable attendance").

This case is directly analogous to *Samper,* for example, which the Sixth Circuit has cited with approval. *Samper* involved a hospital employee who suffered from fibromyalgia, a

---

> materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

condition that limited her ability to sleep and caused severe pain. The employee exceeded her employer's limits for unplanned absences. After the employer tried several other unsuccessful accommodations, including moving shifts and a part-time work schedule, the employee sought an accommodation of additional ongoing intermittent leave. The employer denied the request and terminated the employee. The appeals court held that the employee's requested accommodation was unreasonable as a matter of law and that the employer's termination decision was not actionable under the ADA.

Here, JNL granted Wheeler multiple accommodations, including several leaves of absence and a major job restructuring to the FIW position. However, these efforts did not result in Wheeler's return to regular and predictable attendance and performance of the essential functions of the FIW position. Wheeler does not, and cannot, dispute that his physicians informed JNL in July and August 2013, following his unreported absences in May and June of 2013, that his ability to regularly and predictably attend work had deteriorated and would remain in that state for the foreseeable future. Then, in August of 2013, Wheeler sought an open-ended schedule that would allow him to come and go as he pleased from JNL's physical worksite.[37] It is precisely this type of arrangement that courts have found to be inherently unreasonable. *See Waggoner*, 169 F.3d at 485 (noting that "[t]here are limits to how far an employer must go in granting leave" and holding request unreasonable because "[plaintiff] simply wanted to miss work whenever she felt she needed to and apparently for so long as she needed to"); *Jackson v. Veterans Admin.*, 22 F.3d 277, 279-80 (11th Cir. 1994) (denying employee's claim that he could

---

[37] It is undisputed that Wheeler did not propose a quantified number of unplanned absences that he was seeking as an accommodation in the future.

have satisfied a presence requirement for tasks that must be performed daily with an accommodation for unpredictable, sporadic absences).

Accordingly, because the accommodation proposed by Wheeler was unreasonable as a matter of law, JNL is entitled to summary judgment on Wheeler's ADA failure to accommodate claim. JNL is also entitled to summary judgment on Wheeler's TDA failure to accommodate claim because there is no duty to accommodate under the TDA. *Burress v. City of Franklin*, 809 F. Supp. 2d 795, 817 (M.D. Tenn. 2011) (citing *Anderson v. Ajax Turner Co.*, No. 01A01–9807–CH00396, 1999 WL 976517, at *4 (Tenn. Ct. App. Oct. 28, 1999); 94 Op. Tenn. Att'y Gen. 024, 1994 Tenn. AG LEXIS 24 (Mar. 10, 2004) ("The Tennessee Human Rights Commission should not require reasonable accommodation of a handicapped employee under current state law in light of various court opinions holding that the state statute does not require accommodation.").

### 3. ADA Failure to Engage in "Interactive Process" Claim

Wheeler also advances a claim that JNL not only failed to accommodate him but also failed to even engage in the "interactive process" required by the ADA regarding a proposed accommodation. JNL argues that this claim must fail because Wheeler has not proposed a reasonable accommodation under the ADA and, on the undisputed facts, one would not have been possible.

To determine the appropriate modification or adjustment necessary to accommodate an employee, the ADA's regulations indicate that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation. This process should identify the precise limitations resulting from the disability

and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. §

1630.2(o)(3). While not set forth in the text of the ADA, the Sixth Circuit has held that "the

interactive process is mandatory, and both parties have a duty to participate in good faith."

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008). Accordingly, "[w]hen

a party obstructs the process or otherwise fails to participate in good faith, 'courts should attempt

to isolate the cause of the breakdown and then assign responsibility.'" *Kleiber*, 485 F.3d at 871

(6th Cir. 2007) (quoting *Bultemeyer v. Fort Wayne Cnty. Schs.*, 100 F.3d 1281, 1285 (7th Cir.

1996)).

Importantly, however, failure to engage in the interactive process is only an independent

violation of the ADA if the plaintiff establishes a *prima facie* showing that he proposed a

reasonable accommodation, *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (citing

*Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013)), or if a reasonable accommodation

would have been possible, *Lafata v. Church of Christ Home for Aged*, 325 F. App'x 416, 422

(6th Cir. 2009) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (*en banc*),

*judgment vacated on other grounds*, 535 U.S. 391 (2002)). Stated differently, even if an

employer did not engage in a good faith interactive process, an employee cannot prevail on such

a claim if he cannot establish that he could have been accommodated but for the employer's

failure to engage in the interactive process. *Trout v. Aerospace Testing Alliance*, 303 F. App'x

272, 274 n.** (6th Cir. 2008); *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005) (finding

there was no violation of the ADA for failing to engage in interactive process because the

employee's disability "could not be reasonably accommodated") (citing *Taylor v. Phoenixville

Sch. Dist.*, 184 F.3d 296, 320 (3d Cir. 1999)); *see also Burns v. Coca-Cola Enters., Inc.*, 222

F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to create new jobs . . . in order to accommodate a disabled individual.").

As discussed above, Wheeler requested an accommodation that was unreasonable as a matter of law. Indeed, Wheeler proposes no different accommodation now. Wheeler's position has not changed – he has consistently sought the accommodation of not having to meet the regular attendance and telephone Queue requirements of the FIW position. Accordingly, JNL was (and is) relieved of its obligation to engage in the interactive process.[38] Wheeler's lengthy argument at summary judgment boils down to the contention that, if JNL had considered the matter closely enough, it would have differently concluded that his ongoing leave request was reasonable. This is not the legal standard; JNL was not obliged to negotiate Wheeler's non-attendance. JNL is, therefore, entitled to summary judgment on this claim.

### 4. ADA and TDA Retaliation Claims

Under the ADA's retaliation provision, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To establish a

---

[38] Wheeler also argues that JNL failed in its interactive process responsibilities by terminating him instead of granting him a "compelled accommodation" of general leave. Under this argument, when, on August 5, 2013, JNL allowed Wheeler to be terminated or request a general leave while JNL spoke further with Wheeler's medical providers, and Wheeler accepted the general leave, the leave became a "compelled accommodation" that bound JNL into an interactive process going forward. This argument is without merit. The general leave offered by JNL on August 5, 2013 was (1) not compelled and (2) for the specific, limited purpose of follow-up with Wheeler's medical providers and further decisionmaking by JNL. Thus, when JNL received the medical information and made its termination decision on August 9, 2013, there was no disruption of any ongoing interactive process.

*prima facie* case of retaliation, Wheeler must show that (1) he engaged in activity protected by the ADA; (2) JNL knew of this exercise of Wheeler's protected rights; (3) JNL subsequently took an employment action adverse to Wheeler or subjected Wheeler to severe or pervasive retaliatory harassment; and (4) there was causal connection between the protected activity and the adverse employment action. *Hurtt v. Int'l Servs., Inc.*, No. 14-1824, 2015 WL 5332531, at *7 (6th Cir. Sept. 14, 2015) (citing *Steward v. New Chrysler*, 415 F. App'x 632, 643-44 (6th Cir. 2011)). The required causal connection is a "but for" relationship. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012). "If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). The plaintiff then bears the burden of proving that the defendant's "proffered reason for the action was merely a pretext for discrimination." *Id.* (citation omitted).

JNL does not dispute that Wheeler has pleaded a *prima facie* case, and the court agrees. As discussed *supra*, JNL has offered evidence that it terminated Wheeler because he was likely to require intermittent leave on an ongoing and unpredictable basis for the foreseeable future, with no apparent likelihood that his ability to perform the essential functions of his job – *i.e.*, to routinely and regularly report to work and be logged into the telephone Queue to take calls – would improve. The court finds that this is sufficient evidence of a legitimate, non-retaliatory explanation for Wheeler's discharge.

At the final stage of the *McDonnell Douglas* inquiry, the burden of production requires the plaintiff to prove the employer's proffered reasons for its adverse actions against the employee were, in fact, pretext for retaliation. Wheeler must therefore establish that these stated

44

reasons are pretext by producing "enough evidence to . . . rebut, but not to disprove [JNL's] proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014) (internal quotation marks omitted). He may do this by showing that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate JNL's action, or (3) the proffered reason was insufficient to motivate JNL's action. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)); *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998) .

The primary evidence that Wheeler has offered for why his termination is a pretext is (1) no action was taken against Cross or Douglas in response to Wheeler's complaints about them and (2) Wheeler was terminated within one month of having lodged those complaints.[39] The timing of Wheeler's complaints against Cross and Douglas, however, belie this argument. Wheeler only complained about those individuals *after* Douglas questioned and began to investigate whether Wheeler had been present and working in May and June of 2013. Accordingly, JNL's actions that set in motion the process that led to Wheeler's eventual termination *preceded* the complaints that Wheeler claims were the basis of retaliation.

---

[39] Wheeler also asserts the following are evidence of retaliation: (1) compelling a discriminatory accommodation that was not the most appropriate, necessary, or even needed accommodation; (2) refusing to consider Wheeler's proposed alternative accommodation of ongoing intermittent leave; (3) recanting on permissions to work while JNL considered his compelled leave accommodation; (4) denial of the requested [albeit compelled] accommodation request; and (5) termination. These "events" (which are, in effect, bald unsupported descriptors) are all connected with JNL's conclusion – determined to be legally correct by this court – that there was no reasonable accommodation that was necessary for JNL to provide, once it had reconciled Wheeler's attendance and sought clarification from Wheeler's medical providers. The fact that there was no reasonable accommodation cannot alone constitute evidence of retaliation, nor can the lone fact of termination based on lack of any available accommodation. If the latter were the case, as JNL correctly suggests, every employee who suffers an adverse discrimination action would potentially have a viable retaliation claim.

Moreover, other evidence suggests that the JNL human resources apparatus at least took Wheeler's complaints seriously enough to put him in contact with Douglas's human resources superior so he could voice his concern to someone new and outside the local operating chain. The court does not find that evidence concerning Wheeler's nebulous complaints about Cross and Wheeler rebut the legitimate, non-retaliatory explanation for Wheeler's discharge put forth by JNL. Nor does the timing of Wheeler's discharge *vis a vis* the complaints, which is not so close as to automatically raise the spectre of retaliation without further direct or circumstantial evidence in support. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762-63 (6th Cir. 2012). Wheeler's other arguments – *e.g.*, that JNL put him "under a microscope" or that Wheeler encountered a "nosedive in treatment" when JNL realized that it needed to account for Wheeler's whereabouts in May and June of 2013 – are unpersuasive. These characterizations of JNL's reconciliation efforts do not create a dispute of material fact about whether Wheeler was mistreated because, as discussed *supra*, an employer is not obligated to continue to indulge an employee with accommodations that are unsuccessful, particularly in the face of deteriorating medical circumstances.

Accordingly, the court does not find that Wheeler has demonstrated pretext. JNL is, therefore, entitled to summary judgment on Wheeler's ADA and TDA retaliation claims.

### 5.    Hostile Work Environment Claim

Wheeler claims that he was subject to harassment that constituted a hostile work environment. To establish a claim of hostile work environment based on disability, a plaintiff must prove that: (1) "[he] was disabled; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [his] disability; (4) the harassment unreasonably interfered with [his]

work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 460-61 (6th Cir. 2002) (citing *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997); *see also Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004) (same). To prove a hostile work environment, the employee must show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Sasser*, 159 S.W.3d at 584. Conduct that is "merely offensive" does not rise to the level of that which will support a claim of hostile work environment. *Harris*, 510 U.S. at 21. "The court must look at the totality of the circumstances, considering the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 448 (6th Cir. 2002).

Wheeler claims that the following factors contributed to the hostile work environment that he faced at JNL: "(1) multiple incidents of discriminatory comments by Douglas and Cross; (2) constant interactions in condescending and intimidating tones with Douglas and Cross; (3) regular ridicule and negative comments from Douglas and Cross; (4) increased monitoring and placement under atypical/adverse performance microscope after complaining about perceived discrimination and leave mismanagement; (5) deprivation of entitled rights under the FMLA; (6) discriminatory-based compulsion to request a "continuous" general leave accommodation against

company policy, practice, and need of Plaintiff; (7) the complete failure to engage in the interactive process; the complete failure to consider appropriate reasonable accommodation and denial of the compelled accommodation request; (8) the complete failure to consider undue hardship; (9) various forms of retaliation; and (10) termination on the basis of disability." (Docket No. 46 at pp. 31-32.) Of these factors, only the first four could arguably fall within the ambit of workplace harassment; the remainder are merely restatements of Wheeler's other legal claims.

The first three factors cover Wheeler's interactions with Cross and Douglas. Wheeler has testified that (1) Cross made several comments that Wheeler believed were meant to single him out and treat him differently, including: "what's wrong?," "what's wrong with you?," "why can't you be here?," and "what do you have going on with you?" Wheeler further testified that Cross's questions "bothered" him on one occasion when Cross asked "what is wrong with you" in front of other employees. Wheeler also claims Cross spoke to him in a "hostile" tone of voice and laughed about his condition in front of others. Wheeler has separately testified that Douglas commented to him "if you owned a company, would you hire somebody like you [and with your conditions] as an employee?"

Critically, there is no evidence that Wheeler was ridiculed or insulted because of his disability to the point that it "permeated" his work environment and affected his job performance. *See, e.g., Hardenburg v. Dunham's Athleisure Corp.*, 963 F. Supp. 2d 693, 708 (E.D. Mich. 2013) (holding that, in the absence of evidence of permeating ridicule or insults regarding a disability, no reasonable trier of fact could find that plaintiff suffered from an ADA hostile work environment). Wheeler has adduced no evidence to establish that the conduct of Cross and

48

Douglas, however unseemly, caused him to ever suffer in the performance of his work duties, not come to work, or leave work. To the contrary, Wheeler has attributed the negative impacts on his work performance and attendance to his disabilities.

Moreover, these particular comments and tonal choices do not rise to the level of sufficient severity to have created a hostile work environment. *See, e.g.*, *Batuyong v. Gates*, 337 F. App'x 451, 457 (6th Cir. 2009) (holding that supervisor who "raised his voice, inappropriately, became verbally abusive, and chastised [plaintiff] in front of others" did not create hostile work environment); *Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250 (6th Cir. 2008) (finding that supervisor's derogatory name calling was insufficient to establish hostile work environment, especially where the plaintiff did not produce any evidence that it was sufficiently severe or threatening to interfere with the plaintiff's work performance); *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (concluding that supervisor's "contentious oral confrontation" with yelling, "stern words about [plaintiff's] ability to walk" and "words express skepticism regarding [plaintiff's] condition" did not create hostile work environment); *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002) (holding that being called "looney toon," "wacko," "crazy," and "Rambo" was insufficient to create hostile work environment) (citing *McClain v. Southwest Steel Co.*, 940 F. Supp. 295 (N.D. Okla. 1996) (holding that references to plaintiff as "crazy" and "lunatic" and asking "what the f ___'s wrong with you" did "not create an environment so hostile as to constitute an adverse employment action under the ADA")).

The fourth of Wheeler's factors – "increased monitoring and placement under atypical/adverse performance microscope" by JNL – is essentially a complaint rooted not in

49

hostility related to work environment, but, rather, in Wheeler's sensitivity to what he perceived to be JNL's newly-unfair focus on his job performance. However, hostile work environment law is not designed to preclude an employer from evaluating its employees' performance, even "under a microscope" as Wheeler suggests. Indeed, the Sixth Circuit has held that "[c]onversations between an employee and his superiors about his performance does [sic] not constitute harassment simply because they cause the employee distress." *Keever v. City of Middleton*, 145 F.3d 809, 813 (6th Cir. 1998). JNL was free to closely monitor Wheeler to determine if he was working on the days for which he was being paid, and it was allowed to discuss those issues with Wheeler without later being guilty of harassment. Even if JNL distressed Wheeler personally by putting him under a "performance microscope" that was not typical for all JNL employees, it did not violate the law in doing so.

Accordingly, Wheeler does not raise a genuine issue of material fact as to his hostile work environment claim and JNL is entitled to summary judgment.

### B.      Tennessee Common Law and TPPA Retaliatory Discharge Claims

Wheeler claims that JNL violated the common law of Tennessee when it terminated him "in retaliation for exercising his rights." (Docket No. 69, ¶ 58). However, the common law tort of retaliatory discharge is preempted by the THRA and TDA. *Esberger v. Williamson Cnty. Gov't*, 2015 WL 3929689, at *9-10 (M.D. Tenn. June 2, 2015) (holding that common law retaliatory discharge claims arising out of disability discrimination are preempted by Tennessee statute); *Pigott v. Battleground Academy*, 909 F.Supp.2d 949, 967 (M.D. Tenn. 2012) (noting that the THRA makes it a discriminatory practice to retaliate against someone who has opposed a practice declared discriminatory by statute, and finding that the common law tort of retaliatory

discharge is preempted by the THRA); *see also Smiley v. Cumberland Mach. Co.*, No. 3:14-CV-00454, 2014 WL 3112371, at *2 (M.D. Tenn. July 7, 2014) (holding that, although disability discrimination is primarily addressed under the Tennessee Disability Act, "the TDA works in conjunction with the THRA to provide a cause of action for disability discrimination") (citing *Perlberg v. Brencor Asset Mgmt.*, 63 S.W.3d 390, 394 (Tenn. Ct. App. 2001)); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000). Thus, summary judgment will be granted to JNL.

Wheeler also brings a claim for retaliatory discharge under the TPPA. The TPPA provides in pertinent part:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
> . . .
> (d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50–1–304(b, d). In order to make out a TPPA claim, Wheeler must establish: (1) his status as an employee JNL; (2) his refusal to participate in, or remain silent about, 'illegal activities' as defined under the TPPA; (3) his termination; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination. *Clark v. Hoops, LP*, 709 F. Supp. 2d 657, 669-70 (W.D. Tenn. 2010) (internal alterations and quotation marks omitted) (quoting *Franklin v, Swift Trans. Co., Inc.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2006)). The TPPA defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50–1–304(a)(3). The key

difference between the TPPA and Tennessee common law retaliatory discharge doctrine is that the TPPA requires a plaintiff to demonstrate that his activity was the *sole* cause of his termination. *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 869 (E.D. Tenn. 2013). A plaintiff has a "formidable burden" in establishing the fourth element of the cause of action. *Darnall v. A+ Homecare, Inc.*, No. 01–A–01–9807–CV00347, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999).

Here, generously assuming that Wheeler satisfied the second prong of the *prima facie* case by complaining about violations of the FMLA by JNL, as to the fourth prong JNL has nonetheless offered evidence that it had the authority to terminate Wheeler based on (1) his inability to perform the essential functions of the FIW position and (2) its discretion to not extend any further general unpaid leave under company policy. It is undisputed that Wheeler's doctors opined that his likely need for intermittent leave had increased, regardless of whether Wheeler agreed that he would or would not need the leave. It is also undisputed that Wheeler had no right under company policy to perpetually available general leaves of absence, regardless of whether or not JNL traditionally granted or denied them to others. Accordingly, the court finds that there is not a genuine issue of material fact as to whether Wheeler's complaints about Douglas and Cross were the exclusive cause of his termination. *See Caruso v. St. Jude Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 938 (W.D. Tenn. 2002) (holding that, because "[the defendant] . . . established that there were reasons other than, or in addition to, [the plaintiff's] complaints for her discharge, [the plaintiff] . . . failed to meet the stringent standard of showing that her complaints were the sole reason for her termination"); see also *Levan*, 984 F. Supp. 2d at 872 (finding summary judgment appropriate where the employer offered evidence that it had the

authority to terminate the employee based on his violation of company policy, and it was undisputed that the employee violated company policy, regardless of whether he did so knowingly).  Accordingly, JNL is entitled to summary judgment on Wheeler's TPPA retaliatory discharge claim.

### C.    FMLA Claims

Under the FMLA, employees are entitled to take twelve weeks of leave for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(1)(D).  The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Employees who return to work within the approved twelve-week period are entitled to reinstatement to their previous or an equivalent position.  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (quoting 29 U.S.C. § 2614(a)(1)).  The Sixth Circuit consistently has held that "an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Id.* at 506-07; *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571-72 (6th Cir. 2007); *Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840, 845 (6th Cir. 2000) (concluding that an employee who was unable to resume her duties at the end of her FMLA leave period suffered no harm when terminated), *rev'd on other grounds*, 534 U.S. 184 (2002); *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir.1998) (holding the employee had no FMLA claim

when evidence was undisputed that employee was unable to return to work within period provided by FMLA).

The FMLA prohibits a covered employer from interfering with, restraining, or denying the exercise of its employees' rights under the statute. 29 U.S.C. § 2615(a)(1). Furthermore, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2). Two distinct theories of recovery arise under the FMLA. *Edgar*, 443 F.3d at 507; *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). The "entitlement" or "interference" theory, "derived from the FMLA's creation of substantive rights," provides that a violation of the FMLA occurs if an employer interferes with an employee's right to take medical leave or to be reinstated after the leave. *Arban*, 345 F.3d at 401. The "retaliation" theory provides protection for an employee who is discriminated against for exercising her rights under the FMLA. *See Hunter v. Valley View Local Sch.*, 579 F.3d 688, 690-91 (6th Cir. 2009) (noting that employers are prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions" (alteration in original) (quoting 29 C.F.R. § 825.220(c)) (internal quotation marks omitted)).

### 1. Interference Claim

29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA. 29 U.S.C. § 2615(a)(1). To succeed on an interference claim, Wheeler must show that (1) he was an eligible employee, (2) JNL was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave JNL notice of his intention to take leave, and (5) JNL denied

him FMLA benefits to which he was entitled. *Edgar*, 443 F.3d at 507 (6th Cir. 2006) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)); *Jones v. Sharp Electronics Corp.*, 932 F. Supp. 2d 893, 902 (W.D. Tenn. 2013).

Wheeler claims that JNL interfered with his right to take FMLA leave. As an initial matter, it is undisputed that JNL granted Wheeler each FMLA leave request prior to May, June and July of 2013. The only issue before the court, therefore, is the reconciliation of Wheeler's May and June absences as FMLA leave days and the exhaustion of Wheeler's rolling twelve weeks of FMLA leave due to those absences. As discussed in this opinion at length, the undisputed record reflects that, between April 24, 2013 and July 12, 2013 (a 58 working-day period), Wheeler had not used his identification badge to enter the JNL worksite and had not logged into the phone system as being physically present at work on 34 of the 58 work days. The undisputed record further reflects that Wheeler arrived to work after 12:00 p.m. on June 7, 13, 18, 21 and 24. Also as discussed herein, JNL concluded, and the court concurs, that Wheeler was not performing the essential functions of the FIW positions on those days, regardless of whether he claims to have been working from home. The record reflects that JNL performed a reconciliation of these absent and tardy dates that was completed on July 25, 2013. JNL's reconciliation concluded that Wheeler had exhausted his available intermittent FMLA leave as of July 5, 2013. JNL elected to cover all of Plaintiff's absences through July 5, 2013 with the 240 hours of FMLA time that had been available to Plaintiff prior to May of 2013. Accordingly, Wheeler's primary argument in favor of his FMLA interference claim – that he was actually working on the days that JNL reconciled as FMLA leave days in May and June of 2013 – is without merit.

55

Wheeler suggests that the reconciliation is incompatible with the June 19 Eligibility Notice that he received. However, JNL's reconciliation, and its conclusions regarding the assessment of Wheeler's utilized FMLA leave days, supplanted any prior statement in June or July of 2013 as to the availability of remaining available leave days in the current rolling twelve-week period. Indeed, the June 19 Eligibility Notice (which expressly stated that, as of that date, Wheeler was "eligible for FMLA leave" and had "240 hours available due to previous occurrences") necessarily became *inaccurate* when, after its issuance, JNL became aware of Wheeler's absences in May and June of 2013 and began to investigate them.

At various times in his briefing, Wheeler puts forth a very convoluted argument that JNL conducted two separate reconciliations of his available FMLA time – one, prior to Wheeler's complaints to JNL, that calculated he had FMLA time available, and a second "re-reconciliation," subsequent to his complaints to JNL and the issuance of the July 16 Eligibility Notice, that eventually calculated that he had no additional FMLA time available. The court has carefully reviewed the record and finds that the documentary evidence simply does not support Wheeler's position. The record reflects that JNL, as two separate events, sent Wheeler the July 16 Eligibility Notice, and subsequently conducted only one reconciliation of Wheeler's May and June 2013 attendance with available FMLA leave. Wheeler has adduced no record evidence to support the claim that JNL's reconciliation had any connection to the July 16 Eligibility Notice,[40]

---

[40] The July 16 Eligibility Notice only informed Wheeler that he was eligible for FMLA leave and did not state how many hours of FMLA time Plaintiff had available. (Docket No. 55-1 at pp. 33-34.) The form describes the elements necessary to be eligible for FMLA leave and does not speak to whether Wheeler had exhausted his annual twelve week FMLA leave entitlement. According to Douglas, she issued the form based on information provided by Sheri Thuma, in response to Wheeler's renewal of his request for FMLA intermittent leave and the initial medical certification which Wheeler provided on July 5. (Docket No. 55-3 at p. 36.) This is unconnected

nor has Wheeler offered record support for the assertion that JNL had made any earlier

reconciliation determination indicating that Wheeler had any FMLA time available. Indeed,

Douglas testified that the reconciliation effort was not completed until July 25, and her testimony

is supported by an email that she sent to Cross on July 23, stating that she had not yet completed

the reconciliation effort at that time.

Because there is no evidence that Wheeler was entitled to FMLA leave beyond the leave

granted by JNL through July 5, 2013, JNL is entitled to summary judgment on Wheeler's FMLA

interference claim. *See, e.g., Jones*, 932 F. Supp. 2d at 902 (noting summary judgment is proper

on interference claim where an employee has exhausted all leave under the FMLA and is

therefore not entitled to further FMLA leave).

### 2.    Retaliation Claim

FMLA retaliation claims based on circumstantial evidence are evaluated pursuant to the

same *McDonnell Douglas* burden-shifting framework as the ADA/TDA retaliation claims

discussed *supra*. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001).

Unlike an FMLA interference claim, an FMLA retaliation claim "requires proof of retaliatory

intent." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006). Here, Wheeler

testified that he had been taking FMLA leave for years and "it had worked very well," he had

received good reviews, and then "that changed and it seems discriminatory to [him]." (Pl. Dep.

pp. 252-256.) Wheeler further testified that he believed that Douglas terminated his employment

in retaliation for his taking FMLA leave because he could not "understand any other reason why

that would have happened." (*Id*.) This is not proof of retaliatory intent, and it is insufficient to

---

to the reconciliation.

establish a *prima facie* case of retaliatory discharge under the FMLA. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (noting that conclusory allegations and subjective beliefs do not raise a triable issue as to pretext). Indeed, JNL's efforts to protect the plaintiff with multiple periods of leave do not bespeak retaliatory intent.

Even if the court were to overlook Wheeler's lack of evidence of retaliatory intent and assume that he has made out a *prima facie* case, he cannot overcome JNL's legitimate and non-discriminatory reason for terminating his employment. In short, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, . . . the employee has no right to restoration to another position under the FMLA." 29 C.F.R. § 825.216(c). Because JNL had advice from Wheeler's doctors that he would need ongoing intermittent leave and, therefore, would not be able to fulfill the essential requirements of the FIW position (regular attendance and being logged into the telephone Queue to take calls), there is sufficient evidence that JNL terminated Wheeler's employment because he was unable to return to work in a manner that fulfilled the essential functions of his position upon the expiration of his FMLA leave.

Moreover, the record is lacking in evidence of a causal connection between Wheeler's use of FMLA leave and his termination. *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432-33 (6th Cir. 2014) (holding that a plaintiff must demonstrate that there was a causal nexus between the protected activity and the adverse employment action). To the contrary, the record reflects that JNL granted Wheeler numerous leaves over multiple years, including generous FMLA and unpaid general leave. Wheeler has not adduced evidence of

animus on the part of JNL specifically related to any of Wheeler's requests for FMLA leave. Accordingly, Wheeler also does not sufficiently establish pretext.

JNL is, therefore, entitled to summary judgment on Wheeler's FMLA retaliation claim.

## II.    The Plaintiff's Motion for Summary Judgment

The court has independently considered Wheeler's motion and finds it to be without merit.  Wheeler is not entitled to judgment as a matter of law on any claim.  Accordingly, Wheeler's motion for summary judgment will be denied.

## CONCLUSION

The defendant Jackson National Life Insurance Co.'s Motion for Summary Judgment (Docket No. 32) and Supplemental Motion for Summary Judgment (Docket No. 71) will both be **GRANTED**.  The plaintiff Josh Wheeler's Motion for Summary Judgment (Docket No. 37) will be **DENIED**.

An appropriate order will enter.

_____
     ALETA A. TRAUGER
     United States District Judge